## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 10 2017, 8:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Mark K. Leeman
Logansport, Indiana

Jacob A. Ahler
Rensselaer, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

A.M. (Minor Child),

And

R.M. (Father) and A.T. (Mother),

*Appellants-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

August 10, 2017

Court of Appeals Case No. 09A04-1701-JT-70

Appeal from the Cass Circuit Court

The Honorable Leo T. Burns, Jr., Judge

Trial Court Cause No. 09C01-1604-JT-1

**Riley, Judge**

## STATEMENT OF THE CASE

Appellants-Respondents, A.T. (Mother) and R.M. (Father) (collectively, Parents), appeal the trial court's Order terminating their parental rights to their minor child, A.M. (Child).

We affirm.

## ISSUE

Although Parents have filed separate appellate briefs, we consolidate the various issues raised and restate the sole issue as: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of Parents' parental rights.

## FACTS AND PROCEDURAL HISTORY

Mother and Father are the biological parents of the Child, born on June 14, 2011. Father established his paternity for the Child at birth by executing a paternity affidavit. Although Parents are not married, they met in approximately 2006 and lived together with the Child in Logansport, Cass County, Indiana.

In November of 2013, both Father and Mother were arrested on a plethora of charges. Specifically, Father was charged with armed robbery, a Class B felony; dealing in a Schedule I controlled substance (*i.e.*, heroin), a Class B felony; possession of a controlled substance (*i.e.*, heroin), a Class D felony;

unlawful possession of a syringe, a Class D felony; pointing a firearm, a Class D felony; neglect of a dependent (*i.e.*, the Child), a Class D felony; possession of marijuana, a Class A misdemeanor; possession of paraphernalia, a Class A misdemeanor; and failure to stop after accident resulting in damage to an unattended vehicle, a Class B misdemeanor. Mother was similarly charged with dealing in a Schedule I controlled substance (*i.e.*, heroin), a Class B felony; possession of a controlled substance (*i.e.*, heroin), a Class D felony; unlawful possession of a syringe, a Class D felony; and neglect of a dependent (*i.e.*, the Child), a Class D felony. For a few days, the Child stayed with his maternal grandmother until Mother was released on bond. Father, however, remained incarcerated.

[6]     While released on bond, on March 5, 2014, Mother injected herself with heroin at a friend's home; the two-year-old Child was in a nearby room at the time. Mother subsequently lost consciousness, and the friend drove her and the Child to the Logansport Police Department. From there, Mother was transported by ambulance to the emergency room at Logansport Memorial Hospital. At some point, Mother admitted to police officers that she had used heroin, and a drug screen revealed opiates, methamphetamine, and amphetamine in her system. Mother was admitted to the hospital, and the Cass County office of DCS was notified that Mother had overdosed in the Child's presence. Due to Father's incarceration and Mother's inability to care for the Child, DCS obtained an emergency detention order and immediately took the Child into custody. DCS placed the Child in the care of his paternal aunt and uncle. On March 7, 2014,

DCS filed a petition alleging the Child to be a Child in Need of Services (CHINS). On March 19, 2014, Parents admitted to the allegations in the CHINS petition, and the trial court adjudicated the Child to be a CHINS.

[7] On April 9, 2014, the trial court held a dispositional hearing. On April 11, 2016, the trial court issued a dispositional order, directing Parents to participate in services designed to reunify them with the Child. Specifically, the trial court ordered Parents, in part, to: contact DCS on a weekly basis; maintain safe, stable housing; secure and maintain a legal and stable source of income sufficient to support household members, including the Child; participate in home-based casework services "to assist in establishing and maintaining safe housing, establish budgeting skills, implement consistent, age appropriate parenting, seek resources and supporting their efforts to become sober"; attend all visitation sessions and implement parenting techniques learned during home-based services; enroll in all services recommended by DCS or other service providers; complete a drug assessment and any recommended treatment to achieve sobriety; submit to random drug screens upon request of DCS or any other service provider; refrain from possessing or consuming any alcohol or non-prescribed controlled substances; obey the law; and provide the Child "with a safe, secure and nurturing environment that is free from abuse and neglect and be an effective caregiver who possesses the necessary skills, knowledge and abilities to provide the [Child] with this type of environment on a long-term basis to provide the [Child] with permanency." (Appellant-

Mother's App. Vol. II, pp. 42, 45). Mother was further ordered to pay $51.00 per week in child support.

[8] With respect to Mother, early in the proceedings, she did not comply with her case plan. Shortly after the Child's removal, Mother was enrolled in home-based case services and permitted to have supervised visits with the Child. During visits, Mother had to be redirected to put her cell phone down and interact with the Child, and the Child "was distant and he was very unsure as to how to act around [Mother]." (Tr. Vol. II, p. 84). Within a matter of weeks, Mother had repeatedly failed to appear for appointments and visitation with the Child; thus, her services were terminated. Additionally, Mother had several positive drug screens, but she refused to participate in substance abuse treatment.

[9] On April 28, 2014, the State moved to revoke Mother's bond because she was charged with the additional crime of theft as a Class D felony. After spending some time in the Cass County Jail, in July of 2014, Mother was released to undergo inpatient substance abuse treatment at Tara Treatment Center in Franklin, Indiana. The completion of the three-week treatment program was made a condition of Mother's release, and she successfully complied. On September 16, 2014, Mother pled guilty to possession of a controlled substance, a Class D felony, and neglect of a dependent, a Class D felony. Mother was sentenced to four years, with three years executed through Community Corrections and one year suspended to probation. It also appears that Mother was convicted of her felony theft charge and was sentenced to probation.

Mother was assigned to Community Corrections' work release program. At this point, Mother was fully participating in her DCS case plan. She obtained a factory job at Indiana Packers in Delphi, Indiana; she maintained negative drug screens; she consistently visited with the Child and tried to connect with him; and she participated in therapy and completed addiction classes through Community Corrections. Yet, despite a period of sobriety, on February 27, 2015, a drug screen revealed that Mother had taken a narcotic medication that had not been prescribed. Accordingly, on March 10, 2015, a violation of work release was filed, and Mother returned to jail. On May 5, 2015, the trial court ordered Mother to execute her previously suspended sentence, once again, through Community Corrections.

[10] Upon her return to Community Corrections, Mother continued her employment with Indiana Packers. Notwithstanding her general compliance with her Community Corrections program, Mother displayed a proclivity for disregarding the administrative rules by, for example, failing to timely pay her fees, not doing her assigned chores, and not submitting her time cards. With respect to her DCS case plan, Mother passed all her drug screens and participated in services. She consistently visited the Child three times per week for three hours each visit, under supervision. Mother "always had money for meals[,] [and] [s]he brought supplies to visits." (Tr. Vol. II, p. 99). The visitation supervisor observed that Mother and the Child shared what "seemed like a big sister, little brother kind of relationship than more of a mom and son." (Tr. Vol. II, p. 100). There was a lack of "consistency with positive and

negative reinforcement," and Mother struggled with knowing how to handle the Child's temper tantrums. (Tr. Vol. II, p. 100).

[11] A few months before Mother was set to complete her sentence, her supervision level was downgraded from work release to home detention. As such, Mother moved in to her parents' home. However, shortly thereafter, on February 8, 2016, Mother submitted to a drug screen which yielded positive results for amphetamine, for which Mother did not have a prescription. Accordingly, Mother was sent back to jail for violating the terms of her work release. After her violation, Mother's Community Corrections supervisor also discovered that at the end of October of 2015, Mother had reported that she was at work when, in actuality, Mother had used personal time to visit her boyfriend without authorization.

[12] Following her incarceration, Mother attempted to maintain weekly phone contact with the Child, specifically during the times that the Child was visiting his maternal grandmother. However, the Child's paternal aunt (*i.e.*, his foster mother) was "not comfortable" with the phone calls due to her lack of involvement in them. (Tr. Vol. II, p. 141). The Child's paternal aunt also requested that DCS refer the Child to see a therapist after the Child threw "a fit about something that was really peculiar to [her]" and other concerns about his anger. (Tr. Vol. II, p. 157). The Child's therapist diagnosed him with "an adjustment disorder" and with "symptoms of early attachment disruption based on the history of child neglect." (Tr. Vol. II, p. 68). Upon the therapist's recommendation, all contact between Mother and the Child was terminated.

[13]    Turning to Father, following the Child's removal and CHINS adjudication, he did not participate in his DCS case plan due to his incarceration. On June 16, 2014, Father pled guilty to possession of a controlled substance, a Class D felony; pointing a firearm, a Class D felony; and neglect of a dependent, a Class D felony. He was sentenced to six years, with two years executed in the Indiana Department of Correction, two years executed through Cass County Community Corrections, and two years suspended to supervised probation.

[14]    In October of 2014, Father was released from prison and transferred to Community Corrections to serve his sentence through the work release program. Father obtained factory employment. Additionally, he also had visitation with the Child, and "for a while [he] was calling [the Child] almost every day." (Tr. Vol. II, p. 164). Because Mother was concurrently serving her Community Corrections sentence, she and Father sometimes had joint visitation with the Child. During these times, the visitation supervisor consistently "had to warn [Mother] and [Father] about touching [each other] and not paying attention to [the Child,] and I had to tell them that they couldn't talk about their relationship during the visit and that they had to focus on parenting [the Child]." (Tr. Vol. II, p. 85). Although their relationship status was unclear to Community Corrections officials, Parents were observed displaying affection and had to be warned of Community Corrections' rules against such conduct.

[15]    Community Corrections intended to enroll Father in its addiction programs after Mother had completed them (so that Parents would not interfere with each

other's progress); however, on January 10, 2015, Father submitted to a random drug screen and tested positive for opiates (morphine, heroin metabolite, and codeine). As a result, on April 6, 2015, the trial court reinstated his previously-suspended two-year sentence, to be executed in Community Corrections on top of his existing Community Corrections sentence. On July 3, 2015, Father was sent to Tara Treatment Center for substance abuse treatment; he successfully completed the program on July 24, 2015.

[16] Based upon the recommendation of the providers at Tara Treatment Center, Father requested to be transferred to The Progress House in Indianapolis, which is "like a half-way house, independent living house." (Tr. Vol. II, p. 121). On September 17, 2015, Father moved to The Progress House, and on October 2, 2015, he was evicted because he failed to comply with The Progress House's rules—such as completing chores and other assignments. Accordingly, Father returned to jail. On November 10, 2015, the trial court ordered Father to be placed on home detention in the Agape House, a residential treatment facility in Indianapolis, where he would be subject to electronic monitoring but could continue to be employed. While in Indianapolis, Father briefly worked at a clothing store; he participated in substance abuse treatment classes and home-based services; and he visited with the Child. Father "did really well" in terms of parenting the Child. (Tr. Vol. I, p. 181). However, DCS noted concerns that it "never saw what it would be like for [Father] to discipline [the Child]. We never got to that point to where he was with him long enough for [the Child] to misbehave or have the need for the discipline. That was something that [DCS]

was always concerned about is how will he handle that situation if he's put into that situation." (Tr. Vol. II, p. 181).

[17] On March 20, 2016, Father again violated the conditions of his Community Corrections sentence when he was evicted from the Agape House for possession of fake urine. Instead of reporting to Community Corrections, Father slept in the parking lot at Agape House for more than a week, unbeknownst to the treatment facility. On March 28, 2016, Community Corrections was notified of Father's eviction and subsequently made contact with Father. Father admitted that he did not return to Community Corrections over fear of the consequences, so he slept in his vehicle in the Agape House parking lot to trick his electronic monitoring equipment. Father was ordered to appear, but he did not do so for another three or four days. At that time, Father refused to submit to a drug screen. Accordingly, Father returned to jail and was also subsequently charged with a Level 6 felony for failing to return to lawful detention.

[18] On April 18, 2016, DCS filed a petition to terminate Parents' parental rights to the Child. On September 19 and October 5, 2016, the trial court conducted a hearing on DCS' petition to terminate Parents' parental rights. At the time of the termination hearings, Father was incarcerated, and Mother transitioned from incarceration to work release and living in a residential facility. The Child remained in his relative placement and was thriving; his paternal aunt and uncle intend to adopt him. On December 13, 2016, the trial court issued its Order, terminating Parents' parental rights. The trial court concluded, in pertinent part, that there is a reasonable probability that the conditions resulting

in the Child's removal and continued placement out of Parents' custody will not be remedied; there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being; and termination of Parents' rights is in the Child's best interests.

Parents now appeal. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

### I. *Standard of Review*

Parents appeal the trial court's termination of their parental rights. A parent has an "interest in the care, custody, and control of his or her children [that] is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). The Fourteenth Amendment to the United States Constitution thus safeguards "the traditional right of parents to establish a home and raise their children." *Id.* Nevertheless, it is well established that "parental rights are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (internal quotation marks omitted) (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)). Termination of parental rights is appropriate where "parents are unable or unwilling to meet their parental responsibilities." *In re G.Y.*, 904 N.E.2d at 1259-60. We appreciate that the termination of a parent-child relationship is "an extreme measure and should only be utilized as a last resort when all other reasonable

efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

Upon review of a trial court's termination of parental rights, our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d at 1260. Rather, we "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* Additionally, the trial court issued specific findings of fact and conclusions thereon, which requires application of the two-tiered standard of review set forth in Indiana Trial Rule 52(A): "[f]irst, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id.* We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). A trial court has clearly erred "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)).

## II. *Termination Statute*

To support the termination of a parent's rights, DCS must prove, in relevant part, that a child has been removed from the home for a certain period, and

> (B) that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement

outside the home of the parents will not be remedied.

    (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS].

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS is required to establish each element by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1260.

[23]    On appeal, Parents do not challenge the trial court's conclusions that the Child has been removed from their care for the requisite time or that DCS has established a satisfactory plan for the Child's care and treatment going forward. Rather, they contend that there is insufficient evidence to support the trial court's conclusions that there is a reasonable probability either that the conditions resulting in the Child's removal and continued placement outside the home will not be remedied or that the continuation of the parent-child relationship poses a threat to the Child's well-being[1] and that termination is in the Child's best interests. We address each argument in turn.

---

[1] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; thus, DCS need only prove one of the three elements listed. *See In re A.K.*, 924 N.E.2d 212, 220-21 (Ind. Ct. App. 2010), *trans. dismissed*. In this case, DCS did not allege that the Child has been twice adjudicated a CHINS. Therefore, the relevant inquiry is whether DCS established the existence of a reasonable probability either that the conditions resulting in the Child's removal or continued placement outside the home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the Child's well-being.

## A. *Remediation of Conditions*

[24] In considering whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Child's "placement and retention" outside of the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). In making these decisions, "the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted) (internal quotation marks omitted) (quoting *Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include 'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (internal quotation marks omitted), *trans. denied*.

[25] According to Mother, the evidence does not support a conclusion that there is a reasonable probability that the conditions resulting in the Child's removal and continued placement out of the home will not be remedied. Without

specifically challenging any of the trial court's findings, she argues that the evidence instead establishes that she "made substantial strides in improving herself while incarcerated." (Appellant-Mother's Br. p. 29). She notes that she "became very consistent in exercising parenting time"; she "completed the program[m]ing that was available to her regarding nutrition, budgeting, and parenting. She also took several classes directed at preventing relapse and successfully completed inpatient drug treatment at TARA." (Appellant-Mother's Br. p. 29). Furthermore, her "release from incarceration was imminent," and she was presently employed through work release with plans for employment and housing after her release. (Appellant-Mother's Br. p. 29). Mother further claims that she "had a good sense of what program[m]ing and support network she needed from her family to prevent relapse once released from incarceration." (Appellant-Mother's Br. p. 29). Mother also states that she "only had two positive drug screens and a violation for not reporting a visit with a boyfriend" in a two-year span. (Appellant-Mother's Br. p. 29). Finally, Mother points out that, despite the paternal aunt's attempts to thwart her relationship with the Child, Mother endeavored to maintain contact with him.

[26] Similarly, although he frames it as a challenge to whether the proper evidentiary standard was applied, Father asserts that

> [b]y the time this case reached the termination hearing, . . . Father made it clear to the [c]ourt that he had been compliant in the services he could do while incarcerated, that he had only one failed drug screen in over two years, that he was bonded with [the Child], and that he had employment opportunities awaiting him when he was released from jail. Simply, there was no

prejudice to the State or [the Child] by allowing Father to have the opportunity to continue his services so that reunification could be achieved.

(Appellant-Father's Br. p. 13).[2] Father insists that the present case is analogous to *In re J.M.*, 908 N.E.2d 191, 194-96 (Ind. 2009), wherein our supreme court determined that termination of a parent's rights was inappropriate because the parents, who were both incarcerated, expected to be released soon; parents had engaged in the services required of them while incarcerated; the parents had an established relationship with the child; and the mother had completed her bachelor's degree and the father had employment and housing lined up for the family such that their "ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time."

[27] Parents' arguments largely amount to a request to reweigh the evidence, which we decline to do. *See In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Furthermore, we find that the evidence and the trial court's unchallenged findings establish that this case is distinct from *In re J.M.* in that Parents failed to implement lasting changes to ensure the Child would not suffer future neglect. Here, the Child was removed

[2] Father vaguely challenges the trial court's conclusion regarding the remediation of the conditions resulting in removal, but he has not developed a separate argument regarding whether there was sufficient evidence of a reasonable probability that the continuation of the parent-child relationship poses a threat to the Child's well-being. Thus, he has effectively conceded that Indiana Code section 31-35-2-4(b)(2)(B) was satisfied. We nevertheless elect to address his argument in conjunction with Mother's.

after Mother overdosed on heroin while Father was incarcerated, leaving the Child without a caregiver. Father brazenly argues that "DCS became involved in this case due to . . . Mother's overdose on heroin, not due to . . . Father's incarceration." (Appellant-Father's Br. p. 17). Father completely ignores the fact that if he had been available to properly care for the Child and fulfill *his* parental responsibilities at the time of Mother's overdose, DCS would not have had to take the Child into emergency custody and place him with the paternal aunt and uncle.

[28] Throughout the case, Parents cycled between incarceration and supervision by Community Corrections. During their periods of work release and home detention, Parents were afforded services by DCS and an opportunity to visit with the Child. Parents were also permitted to participate in relevant programs through the Department of Correction and/or Community Corrections. There is no dispute that Parents participated in, and even completed, several substance abuse treatments and classes and home-based services, and they generally did well during their fully-supervised visits with the Child. Parents also testified that they expected to complete their sentences soon after the termination hearing, at which point, Father intended to work for his family's business and find housing, whereas Mother hoped to return to her factory job and live with her parents.

[29] Notwithstanding the positive steps that Parents took, they failed to internalize the lessons and the ramifications of ongoing substance abuse. Parents declined to take responsibility for their conduct and blamed others for their own poor

choices. As the director of Community Corrections testified, Father and Mother habitually refused to learn from their past behavior. They believe that they need only "follow their own rules," "and then when that type of behavior exists that's, that leads to the bigger stuff. That leads to the . . . drug use, to the lying." (Tr. Vol. II, p. 115-16). The trial court found that Parents "have received numerous hours of substance abuse treatment and education"; yet, they "have continued to use illegal substances and commit other illegal acts." (Appellant-Mother's App. Vol. II, p. 115). Mother failed one drug screen while under supervision through work release and another drug screen within a few weeks of moving to her parents' home to serve her sentence on home detention. After the Child's removal and while out on bond, Mother was charged with a Class D felony theft, and she violated a host of Community Corrections rules. While Father may have only technically failed one drug screen, he was evicted from a halfway house for possessing fake urine, and he subsequently refused to submit to a drug screen. Like Mother, Father also refused to consistently comply with the rules of Community Corrections. Moreover, Father further risked his parent-child relationship by committing the additional offense of failing to return to lawful detention in the midst of the CHINS proceedings. *See Castro v. State Office of Family & Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006) ("[I]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children."), *trans. denied*.

[30] Although both Parents claimed that they were sober as of the termination hearing and indicated that they were ready to fulfill their parental duties, the trial court clearly found a lack of credibility in their testimony. Specifically, the trial court found that "Mother's conscious choice to spend time with her boyfriend during hours she was supposed to be at work and subsequently lying to her corrections officer [did] not lend [the trial] court to determine that Mother is willing to put her [Child's] needs above her own wants or show an ability to address and remedy some of the underlying behaviors of lying and sneaking around that surround the use of illegal substances." (Appellant-Mother's App. Vol. II, p. 115). Likewise, the trial court found that Father's excuses for failing to return to lawful detention and submit to a drug screen after being evicted from the Agape House were "incredible and unconvincing." (Appellant-Mother's App. Vol. II, p. 116).

[31] The trial court found that the Parents' conduct throughout the case—relapses, committing new crimes, and refusing to adhere to the conditions of Community Corrections—negated their claims that they had made lasting changes in their lives:

> [Parents] are both unwilling to change their behaviors even on the most basic of levels despite the consequences. The consequence of being denied parenting time with one's child should be enough to promote compliance with the basic rules of [C]ommunity [C]orrections but this did not deter either parent from violating the rules or disregard[ing] them altogether.

(Appellant-Mother's App. Vol. II, p. 116). *See In re Termination of Parent-Child Relationship of D.D.*, 804 N.E.2d at 267 (relying on the parent's "habitual pattern of conduct" as indicative of the parent's inability to remedy conditions). It is clear that the Child's removal and continued placement out of the home was the direct result of Parents' poor decision-making and refusal to prioritize the needs of the Child. Therefore, the trial court did not err as there is sufficient evidence of a reasonable probability that the conditions resulting in the Child's removal and continued placement outside the home will not be remedied.[3]

### B. *Best Interests*

[32] When considering the best interests of a child, we recognize that the purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. "[C]lear and convincing evidence need not reveal that the continued custody of the parent . . . is wholly inadequate for the child's very survival[,] . . . it is sufficient to show . . . that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1234-35 (quoting *Bester*, 839 N.E.2d at 148). To determine whether termination is in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S.*, 987 N.E.2d at 1158. "[C]hildren cannot wait indefinitely for their parents to work toward

---

[3] Based on this determination, we need not address the alternative element of Indiana Code section 31-35-2-4(b)(2)(B) regarding whether the continuation of the parent-child relationship poses a threat to the Child's well-being. *See In re A.K.*, 924 N.E.2d at 220-21.

preservation or reunification—and courts 'need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship.'" *In re E.M.*, 4 N.E.3d at 648 (quoting *K.T.K.*, 989 N.E.2d at 1235). It is well established that "[p]ermanency is a central consideration in determining the [child's] best interests." *K.T.K.*, 989 N.E.2d at 1235 (alterations in original) (quoting *In re G.Y.*, 904 N.E.2d at 1265).

[33] Our courts have long held that "the recommendation by both the [DCS] case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *A.D.S.*, 987 N.E.2d at 1158. Here, DCS recommended that the trial court terminate Parents' rights. DCS testified that Mother "needs a very structured environment in order to succeed," and she has not established that she will be able to provide herself with such upon her release. (Tr. Vol. II, p. 180). Father's pattern of conduct indicates that he "would be someone who[] [is] in and out of [the Child's] life" "due to drug use or doing something that's not legal." (Tr. Vol. II, p. 182). Following a hearing, Father had admitted to DCS that, while he did not want his rights terminated, he doubted his ability to care for the Child full time. The Child's guardian *ad litem* also recommended that termination would be in the Child's best interests—primarily based on the substantial length of time that the Child has been removed without a showing of meaningful improvement by Parents. While the guardian *ad litem* expressed

"some reluctance" based on Parents' limited contact with the Child and the fact that the interactions they did have were positive, the guardian *ad litem* acknowledged that Parents' missed opportunities to demonstrate their parenting abilities were "entirely[ by] their own doing by the decisions that they've made." (Tr. Vol. II, p. 195). The guardian *ad litem* also cited concerns that Parents would, again, relapse.

[34] Nevertheless, Parents contend that the Child's best interests do not support termination of their parental rights. Mother asserts that, even though the Child is bonded with his relative placement, "she has exercised consistent visitation on over a hundred occasions during her incarceration. Mother showed an eagerness to bond with [the Child] and the bond was observed repeatedly by supervisors . . . ." (Appellant-Mother's Br. p. 22). Mother also contends that she "availed herself of several programs" while incarcerated, her release was imminent, and she "had a plan for life after incarceration, available employment, a support network to prevent relapse, and available housing with her family." (Appellant-Mother's Br. pp. 23-24). Father raises similar arguments as to why the Child's best interests preclude termination. He contends that he made a "good-faith measure" to engage in substance abuse treatment and participated in other services and classes, and he visited with the Child. (Appellant-Father's Br. p. 14). Notwithstanding that his repeated bouts of incarceration were solely his own fault and that Father faced pending charges at the time of the termination hearing, Father complains that he "was never given a substantial opportunity to show that he could provide for [the Child]

and be a parent after removal" due to his confinement. (Appellant-Father's Br. p. 14). Finally, Father cites his love for, and bond with, the Child.

[35] The love Parents have for the Child is not in dispute; yet, instead of doing whatever was necessary to reunite with the Child, they chose to repeatedly violate rules and forego their sobriety. The trial court ultimately found that the Child "needs caregivers who can provide him with a nurturing environment that is secure and free of abuse and neglect and meets the [C]hild's needs." (Appellant-Mother's App. Vol. II, p. 120). The trial court specified that Parents "have demonstrated no ability to parent the [C]hild or to provide him with the nurturing, stable, and appropriate care and environment that he requires on a long term basis." (Appellant-Mother's App. Vol. II, p. 120). Evidence was presented that the Child suffers from an "Adjustment Disorder stemming from the trauma he has suffered in his short life." (Appellant-Mother's App. Vol. II, p. 120). While Parents intermittently attempted to comply with their case plans, their recurrent relapses and violations prevented them from establishing that they could care for the Child on a permanent basis going forward. Taking into account the recommendations of DCS and the guardian *ad litem*, along with the evidence of the Child's progress in his relative placement and Parents' lack of meaningful remediation over a two-and-one-half-year period, we agree with the trial court's determination that there is clear and convincing evidence that termination of Parents' rights is in the Child's best interests.

# CONCLUSION

Based on the foregoing, we conclude that the trial court did not clearly err as DCS presented sufficient evidence to support the termination of Parents' parental rights.

Affirmed.

Robb, J. and Pyle, J. concur